UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **DWIGHT G. ADAMS,** | } |
| | } |
| **Plaintiff,** | } |
| | } |
| v. | } Case No.: 2:13-cv-02265-MHH |
| | } |
| **CAROLYN W. COLVIN, Acting** | } |
| **Commissioner, Social Security** | } |
| **Administration,** | } |
| | } |
| **Defendant.** | } |

## MEMORANDUM OPINION

Plaintiff Dwight G. Adams filed this action on December 17, 2013, pursuant to Title XVI of Section 1631(c)(3) of the Social Security Act. Mr. Adams seeks judicial review of the decision by the Commissioner of the Social Security Administration[1] denying his claims for a period of disability and supplemental security income (SSI). *See* 42 U.S.C. § 1383(c). After careful review, the Court remands the Commissioner's decision.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Therefore, she should be substituted for Commissioner Michael J. Astrue as Defendant in this suit. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later opinions should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

I. **STANDARD OF REVIEW**

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and his 'legal conclusions with close scrutiny.'" *Riggs v. Soc. Sec. Admin., Comm'r*, 522 Fed. Appx. 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the findings of the Commissioner. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, the Court may not "reweigh the evidence or decide the facts anew," and the Court must "defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it." *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013) (quoting *Dyer v. Barnhart*, 395 F.2d 1206, 1210 (11th Cir. 2005)). With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the

Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## II. PROCEDURAL AND FACTUAL BACKGROUND

Mr. Adams alleges that his disability began on June 8, 2010. (Doc. 7-6, p. 2). Mr. Adams first applied for social security income benefits under Title XVI in August 2010. (Doc. 7-6, p. 2). The Social Security Administration denied Mr. Adams's application on November 12, 2010. (Doc. 7-4, pp. 2–3). At Mr. Adams's request, an Administrative Law Judge (ALJ) held a hearing on May 31, 2012. (Doc. 7-3, pp. 69–92). At the time of the hearing, Mr. Adams was 51 years old. (Doc. 7-6, p. 2). Mr. Adams has a high school education and past relevant work experience as a corrections officer, a security guard, and a van driver. (Doc. 7-7, pp. 4, 12).

On June 13, 2012 the ALJ denied Mr. Adams's request for disability benefits. The ALJ found that Mr. Adams is not disabled under sections 216(i) and 223(d) of the Social Security Act. (Doc. 7-3, p. 34). In his 14-page opinion, the ALJ described the "five-step sequential evaluation process for determining whether an individual is disabled." (Doc. 7-3, pp. 21–23). The ALJ explained that "[i]f it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step." (Doc. 7-3, pp. 21–22).

The ALJ found that Mr. Adams "has not engaged in substantial gainful activity since June 8, 2010, the alleged onset date." (Doc. 7-3, p. 23). Although Mr. Adams had worked since his alleged disability onset date, his earnings did not rise to substantial gainful activity levels. (Doc. 7-3, p. 24; Doc. 7-6, p. 10). The ALJ noted that Mr. Adams continued to work in spite of his alleged impairments and concluded that Mr. Adams was not unable to engage in any substantial gainful activity. (Doc. 7-3, p. 24). Still, because Mr. Adams's work was not performed above substantial gainful activity levels, the ALJ continued the analysis of Mr. Adams's impairments. (Doc. 7-3, p. 24).

The ALJ determined that Mr. Adams has "the following severe impairments: anxiety disorder, coronary artery disease post heart attack and degenerative joint disease of the knees." (Doc. 7-3, p. 24). He found these impairments to be severe because they have more than a minimal impact on Mr. Adams's ability to perform work on a regular and continuous basis at competitive levels of employment. (Doc. 7-3, p. 24). The ALJ considered Mr. Adams's diagnosed hypertension and his obesity but did not find them to be severe impairments. (Doc. 7-3, pp. 24, 25). The ALJ concluded that none of Mr. Adams's impairments meets or medically equals the severity of one of the listed impairments. (Doc. 7-3, p. 25).

The ALJ also determined that Mr. Adams's mental impairment did not meet or medically equal the criteria of listing 12.06. (Doc. 7-3, p. 25). The ALJ found

4

that Mr. Adams had mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties with concentration, persistence, or pace; and no episodes of decompensation. (Doc. 7-3, pp. 25–26).

Next, the ALJ calculated Mr. Adams's residual functional capacity (RFC). (Doc. 7-3, p. 27). The ALJ determined that Mr. Adams has the RFC to perform light work except that he "can perform occasional push and pull operations with the lower extremities, should never climb ladders, ropes or scaffolds, should never work around hazards, would require a sit/stand option[], would require to [sic] simple, routine tasks, infrequent contact with the public and only occasional changes in work setting. (Doc. 7-4, p. 27). In making this finding, the ALJ examined Mr. Adams's history of cardiac issues. (Doc. 7-3, p. 27). The ALJ indicated that Mr. Adams first suffered myocardial infarction in 2000, resulting in surgery. (Doc. 7-3, p. 27; Doc. 7-10, p. 46). Mr. Adams suffered another cardiac incident on June 8, 2010, which resulted in cardiac catheterization. (Doc. 7-3, p. 27; Doc. 7-14, p. 45). The ALJ noted Mr. Adams's testimony that this incident has resulted in ongoing physical issues such as shortness of breath, dizziness, and episodes of severe chest pain 2-3 times per week. (Doc. 7-3, p. 27). The ALJ determined that this evidence is consistent with Mr. Adams's ongoing cardiac issues. (Doc. 7-3, p. 27).

The ALJ stated that Mr. Adams received a CT scan in June 2010 after Mr. Adams's cardiac incident. (Doc. 3-7, p. 27; Doc. 7-9, p. 2). The scan showed that Mr. Adams's heart and vascular structures were unremarkable. (Doc. 3-7, p. 28; Doc. 7-9, p. 2). The ALJ also noted that Mr. Adams had a chest X-ray, which showed his heart and mediastinum were unremarkable and that Mr. Adams's heart exhibited no significant abnormality or interval change. (Doc. 3-7, p. 28; Doc. 7-9, p. 5). The ALJ concluded from these findings that Mr. Adams's heart issues were not as severe as alleged. (Doc. 3-7, p. 28).

The ALJ noted that Mr. Adams returned for a follow-up appointment two months after his myocardial infarction. (Doc. 3-7, p. 28; Doc. 7-9, p. 38). During this visit, Mr. Adams acknowledged that he had some dizziness and dyspnea on exertion along with chest pains and palpitations, (Doc. 3-7, p. 28; Doc. 7-9, p. 38); however, the ALJ indicated that Mr. Adams had not increased his medications as instructed by his physician, and he only rated his pain at 1 out of 10. (Doc. 3-7, p. 28; Doc. 7-9, p. 38). The ALJ found that this "eroded the claimant's credibility." (Doc. 7-3, p. 28).

The ALJ also considered Mr. Adams's chest X-ray in February of 2011, which showed clear lungs, moderate cardiomegaly, and no significant osseous abnormalities. (Doc. 7-3, p. 28; Doc. 7-11, p. 5). In March 2012, Mr. Adams complained of chest pain similar to the pain he had in June 2010 when he

underwent cardiac catheterization. (Doc. 7-3, p. 28; Doc. 7-14, p. 45). The ALJ pointed out that Mr. Adams had sought minimal treatment for cardiac conditions between 2010 and 2012. (Doc. 7-3, p. 28). Although Mr. Adams stated that he was taking his medication with little relief, the examining physician did not find Mr. Adams's issues to warrant a cardiac catheterization. (Doc. 7-14, p. 47). The ALJ stated that this appeared to be an isolated incident, as Mr. Adams had not complained of chest pains or cardiac complications for some time prior to this event and had not sought ongoing care or management of the impairment. (Doc. 7-3, p. 28).

In regards to Mr. Adams's alleged myocardial infarction, the ALJ found that at a recent consultative treatment exam, Mr. Adams's heart exhibited a normal rate and rhythm, no murmurs and normal heart sounds. (Doc. 7-3, p. 29; Doc. 7-10, p. 70). The ALJ found that this indicates that Mr. Adams's cardiac issues have not impacted his apparent heart function. (Doc. 7-3, p. 29). The ALJ also noted that even though Mr. Adams has not been consistent in seeking treatment for his alleged myocardial infarction, Mr. Adams appears to have retained the ability to function in most respects in his day-to-day life. (Doc. 7-3, p. 29). Based on all the physicians' findings concerning Mr. Adams's heart, the ALJ concluded that while Mr. Adams's coronary artery disease status post heart attack was severe, it was not so severe as to be disabling. (Doc. 7-3, p. 29).

7

The ALJ then examined treatment notes concerning Mr. Adams's alleged degenerative joint disease. (Doc. 7-3, p. 29). An X-ray of Mr. Adams's knees taken in March of 2012 indicated "mild to moderate degenerative narrowing at the medial femorotibial joint space bilaterally with marginal osteophytes." (Doc. 7-3, p. 29; Doc. 7-14, p. 35). This, in addition to some minor patellar enthesopathy and slight varus angulation, indicated to the ALJ that Mr. Adams did exhibit some knee issues consistent with his allegations of pain. (Doc. 7-3, p. 29; Doc. 7-14, p. 35). A consultative physical examination of Mr. Adams concerning gait and posture indicated that while he did have limitations, those limitations did not bar him from work. (Doc. 7-3, p. 29; Doc. 7-10, pp. 70, 71).

The ALJ acknowledged that Mr. Adams stated a need for a cane and braces to manage his knee pain. (Doc. 7-3, p. 29). The ALJ noted that Mr. Adams did not exhibit severe difficulty with ambulation and that Mr. Adams had recently stated that he was able to walk 3 miles and feel "pretty good." (Doc. 7-3, p. 29; Doc. 7-13, p. 15). The ALJ found this impairment to have some impact on Mr. Adams's ability to function in a work setting, and he accounted for the impairment in his RFC findings. (Doc. 7-3, p. 30). Nevertheless, the ALJ concluded that Mr. Adams's knee issues did not bar him from returning to full-time, gainful employment. (Doc. 7-3, p. 30).

The ALJ then assessed treatment notes regarding Mr. Adams's alleged anxiety. (Doc. 7-3, p. 30). Mr. Adams states that he has vivid nightmares 4-5 times a week and that his anxiety affects his ability to concentrate and spend time in public. (Doc. 7-3, p. 30; Doc. 7-10, p. 46). The ALJ noted that despite Mr. Adams's mental health issues, treatment notes indicated that Mr. Adams was alert and oriented and had spontaneous and fluent speech. (Doc. 7-3, p. 30; Doc. 7-13, p. 13). Furthermore, treatment notes state that Mr. Adams had logical and goal-directed thought process with fair insight and judgment. (Doc. 7-3, p. 30; Doc. 7-13, p. 13). The ALJ considered that Mr. Adams's anxiety issues were controlled when he took his prescribed medication and that Mr. Adams admitted he felt better after his dosage increased and he took his medication consistently. (Doc. 7-3, p. 30; Doc. 7-13, pp. 25, 26, 79). The ALJ determined that although Mr. Adams's anxiety was severe, it was not disabling. (Doc. 7-3, p. 31).

The ALJ considered Mr. Adams's history of marijuana abuse. (Doc. 7-3, p. 31). The ALJ noted that Mr. Adams used marijuana sporadically as a coping tool to address anxiety and stress and that Mr. Adams had lost a job in the past due to marijuana use. (Doc. 7-3, p. 31; Doc. 7-13, pp. 32, 74). Because the use was sporadic and because Mr. Adams continued to suffer mental and physical issues regardless of whether he was using marijuana, the ALJ determined that marijuana abuse was immaterial to the disability determination. (Doc. 7-3, p. 31).

In making his disability determination, the ALJ consulted the treatment notes of Disability Determination Services (DDS) physician Dr. Robert Heilpern. (Doc. 7-3, p. 31).  Dr. Heilpern opined that Mr. Adams could perform the full range of light exertional activity, could perform unlimited push and pull, could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, and should avoid moderate exposure to hazards.  (Doc. 7-3, p. 31; Doc. 7-10, pp. 104–111).  The ALJ did not give controlling weight to Dr. Heilpern's opinion because Dr. Heilpern was not an examining physician, but the ALJ did find Dr. Heilpern's opinion to be consistent with the medical evidence of record.  Consequently, the ALJ gave great weight to Dr. Heilpern's opinion.  (Doc. 7-3, p. 31).

In regard to Mr. Adams's mental capacity to perform work, the ALJ consulted the assessment of DDS non-examining psychologist, Dr. Megan Sherod. (Doc. 7-3, p. 31).  Dr. Sherod noted some moderate limitations concerning Mr. Adams's functional capacity that the ALJ considered in making his RFC findings. (Doc. 7-3, p. 31; Doc. 7-10, pp. 100–102).  The ALJ did not give controlling weight to Dr. Sherod's opinion because Dr. Sherod was not an examining psychologist; however, the ALJ found that Dr. Sherod's opinion is consistent with the medical evidence of record, so the ALJ gave Dr. Sherod's opinion substantial weight.  (Doc. 7-3, p. 31).

In addition, the ALJ assessed treatment notes from examining physician Dr. Ashley Thomas, who completed a physical consultative examination of Mr. Adams at the request of the SSA.  (Doc. 7-3, p. 32).  Dr. Thomas opined that Mr. Adams could stand or walk for 6 hours in an 8-hour workday with frequent breaks and that Mr. Adams could sit for 8 hours in an 8-hour workday with frequent breaks.  (Doc. 7-3, p. 32; Doc. 7-10, p. 71).  The ALJ gave Dr. Thomas's opinion significant weight because she had the opportunity to examine Mr. Adams and because Dr. Thomas is familiar with the regulations and practices of the SSA.  (Doc. 7-3, p. 32).

Finally, the ALJ considered a third-party function report that Dwight G. Adams, Jr., Mr. Adams's son, completed.  (Doc. 7-3, p. 32).  Mr. Adams, Jr. stated that Mr. Adams was limited in his ability to lift, stand, reach, walk, talk, climb stairs, and complete tasks.  (Doc. 7-3, p. 32; Doc. 7-7, pp. 45–52).  The ALJ commended Mr. Adams, Jr. for his sincere and caring attitude toward his father, but gave the report very little weight because it was inconsistent with the medical evidence and because Mr. Adams, Jr. is not an approved medical source.  (Doc. 7-3, p. 32).

Based on the vocational expert's testimony, the ALJ determined that Mr. Adams would not be able to perform his past relevant work.  (Doc. 7-3, p. 33).  The ALJ then considered Mr. Adams's age, education, work experience, and RFC

and determined that there are jobs that exist in significant numbers in the national economy that Mr. Adams can perform. (Doc. 7-3, p. 33). The ALJ relied on the testimony of vocational expert William Green, who stated that a person with Mr. Adams's age, education, work experience, and RFC could perform the following representative occupations: assembler, of which there are 1,200 jobs statewide and 60,000 nationwide; marker, of which there are 800 positions statewide and 65,000 nationwide; and production worker, of which there are 700 jobs statewide and 65,000 nationwide. (Doc. 7-3, p. 34). The ALJ concluded that Mr. Adams "has not been under a disability, as defined in the Social Security Act, from June 8, 2010, through the date of this decision." (Doc. 7-3, p. 34).

This became the final decision of the Commissioner on October 17, 2013, when the Appeals Council refused to review the ALJ's decision. (Doc. 7-3, p. 2). Having exhausted all administrative remedies, Mr. Adams filed this action for judicial review pursuant to §205(g) and §1631(c)(3) of the Social Security Act, 42 U.S.C. §405(g) and §1383(c)(3). (Doc. 1, p. 1).

### III.   ANALYSIS

To be eligible for disability insurance benefits, a claimant must be disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in

death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Id.* (citing 42 U.S.C. § 423(d)(1)(A)).

A claimant must prove that he is disabled. *Id.* (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). To determine whether a claimant is disabled, the Social Security Administration applies a five-step sequential analysis. *Gaskin*, 533 Fed. Appx. at 930.

> This process includes a determination of whether the claimant (1) is unable to engage in substantial gainful activity; (2) has a severe and medically-determinable physical or mental impairment; (3) has such an impairment that meets or equals a Listing and meets the duration requirements; (4) can perform his past relevant work, in the light of his residual functional capacity; and (5) can make an adjustment to other work, in the light of his residual functional capacity, age, education, and work experience.

*Id.* (citation omitted). "The claimant's residual functional capacity is an assessment, based upon all relevant evidence, of the claimant's ability to do work despite his impairments." *Id.* (citing *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1545(a)(1)).

Mr. Adams contends that he is entitled to relief from the ALJ's decision because the ALJ's RFC findings were not based on substantial evidence. (Doc. 10, p. 6). Specifically, Mr. Adams states that the ALJ erred in not addressing the consultative physician's testimony regarding Mr. Adams's need for frequent breaks. (Doc. 10, p. 6). The Court agrees.

In making his RFC determination, the ALJ considered the assessment of consultative physician Dr. Ashley Thomas, who stated that Mr. Adams could stand or walk for 6 hours in an 8-hour workday with frequent breaks and could sit for 8 hours in an 8-hour workday with frequent breaks. (Doc. 7-3, p. 32; Doc. 7-10, p. 71). The ALJ stated that Dr. Thomas's opinion was "very credible" and that he gave it "significant weight" because Dr. Thomas had the opportunity to examine Mr. Adams. (Doc. 7-3, p. 32). The ALJ also stated that Dr. Thomas's opinion was consistent with the other substantial evidence in the record. (Doc. 7-3, p. 32).

The ALJ did not take into account Dr. Thomas's opinion that Mr. Adams would need frequent breaks when he posed hypothetical questions to the VE at the hearing. (Doc. 7-3, p. 89). Upon examination by Mr. Adams's counsel, the VE stated that frequent breaks would not be tolerated in the jobs he proposed in response to the ALJ's hypothetical. (Doc. 7-3, p. 92).

> Q:  . . . What tolerances are there for breaks above and beyond standard A.M. and P.M. and lunchtime breaks in those jobs, and the jobs you outlined?
>
> A:  Yeah. I think more than two five-minute breaks in addition would not be tolerated. But people can usually get away with two brief breaks.

(Doc. 7-3, p. 92).

The ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418

14

(11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)). However, the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *Id.* at 418–19 (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). Here, the ALJ did not explain why he discredited Dr. Thomas's findings regarding Mr. Adams's need for frequent breaks.

In *Barnes v. Astrue*, 494 F. Supp.2d 1275, 1277 (N.D. Ala. 2007), the consultative physician determined that the claimant needed "frequent breaks" in an 8-hour workday. The ALJ gave the consultative physician's opinion "great weight" and found it to be consistent with and supported by the evidence in the record. *Id.* at 1277–78. The VE testified that frequent breaks would preclude the plaintiff from any level of work activity. *Id.* Nevertheless, the ALJ determined that the claimant had the RFC to perform light work. *Id.* The Court remanded the case, holding that the ALJ failed to properly demonstrate that the plaintiff could perform other work. *Id.*

Similarly, in this case, the ALJ generally gave significant weight to the consultative physician's opinion, but the ALJ did not explain why he discounted Dr. Thomas's finding that Mr. Adams would need frequent breaks during a workday. In addition, the ALJ did not explain or account for the impact that those breaks would have on the jobs available to Mr. Adams. Given the VE's testimony

that frequent breaks would not be tolerated in the jobs that were responsive to the ALJ's hypothetical, the Court needs more information before it may complete its review of the ALJ's decision that Mr. Adams has the RFC to perform light work.

The Court remands this case to the ALJ so that he may either address his rationale for disregarding Dr. Thomas's finding that Mr. Adams needs frequent breaks during a work day or reconcile his RFC findings with the VE testimony that frequent breaks would not be tolerated in the jobs available to Mr. Adams.

## IV. **CONCLUSION**

For the reasons outlined above, the Court **REMANDS** the decision of the Commissioner for further administrative proceedings consistent with the Court's memorandum opinion.

**DONE** and **ORDERED** this January 13, 2015.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE